JOURNAL ENTRY AND OPINION
{¶ 1} This is an appeal from an order of Judge James M. Porter that granted summary judgment to appellees, Olmsted Manor Skilled Nursing Center, Inc. and Deborah Lontor (collectively, "OMSNC"), on their breach of contract claim against appellant Olmsted Manor, Ltd. ("Olmsted Ltd."). Olmsted Ltd. claims that the judge erred in awarding OMSNC an $88,248.40 rebate payment from the Bureau of Workers' Compensation ("BWC") pursuant to the parties' contract for the sale of a nursing home business. We affirm.
 {¶ 2} On September 10, 1997, OMSNC sold its nursing home business to Olmsted Ltd. for $5,000,000. Article 3.01 of the purchase agreement contained terms for the apportionment of income and expenses:
 {¶ 3} "All income and expense * * * attributable to the operation of the Assets located at the Facility * * * through 11:59 P.M. on the Closing Date shall be for the account of the Seller; thereafter, such income and expense shall be for the account of the buyer. Apportionable income shall include but not be limited to all Medicare and Medicaid reimbursements, Blue Cross or other insurance payments or advances, * * * whether the funds related to such services are received before, on, or after the Closing Date."
 {¶ 4} Under Article 6.01(g), OMSNC agreed to assist Olmsted Ltd. in obtaining "all permits, notices of intent, licenses, approvals and other authorizations to operate the Facility * * *." Further, Article 10.02(d) required OMSNC to assign "all contract rights, and other intangible property and rights constituting part of the Assets" to Olmsted Ltd. Finally, Article 10.04 contained a covenant of further assurances, providing that:
 {¶ 5} "After the Closing, each party to this Agreement shall, at the request of the other, furnish, execute, acknowledge and deliver such money, documents, instruments, certificates, notices or other further assurance as the requesting party shall be required under this Agreement and be reasonably requested as necessary or desirable to effect complete consummation of this Agreement and the transaction contemplated hereby."
 {¶ 6} The sale closed on September 30, 1997, and shortly thereafter Olmsted Ltd. applied for workers' compensation coverage with the BWC. The purchase agreement had no specific provision for transfer of OMSNC's workers' compensation account to Olmsted Ltd., and OMSNC continued to maintain its account after the closing. The BWC informed Olmsted Ltd. that it could qualify for lower premium payments under OMSNC's established "merit rating accident cost experience" if OMSNC would agree to transfer its account into Olmsted Ltd.'s name.
 {¶ 7} It is undisputed that, in order to receive the benefit of this experience rating, Olmsted Ltd. requested OMSNC's agreement to the transfer and on January 7, 1998, the parties executed a BWC "U-9" form applying for the transfer. The transfer form stated, in pertinent part:
 {¶ 8} "We, the undersigned, hereinafter referred to as former employer and succeeding employer, do hereby propose * * * that the Workers' Compensation risk account, together with any merit rating accident cost experience connected with the business and risk account of the former employer be transferred to the succeeding employer.
 {¶ 9} "Further, we mutually agree to the transfer and agree to abide by the terms and conditions of the transfer."
 {¶ 10} The U-9 form also contained separate certifications for the succeeding employer and former employer, stating:
 {¶ 11} "The succeeding employer hereby agrees to assume the premium obligations of the former employer, and further agrees that the workers' compensation experience of the former employer be applied to the succeeding employer. * * *.
 {¶ 12} "The former employer hereby certifies that they have transferred the business formerly conducted to the herein designated succeeding employer and desires to have transferred to the succeeding employer the workers' compensation risk account and experience of the former employer. The former employer hereby agrees to waive all rights to the risk account including premium security deposit and experience of the former employer."
 {¶ 13} On May 20, 1998, the BWC announced that it had surplus funds and would issue rebates to employers who had paid premiums in 1997. There is no dispute that, when signing the purchase agreement or transferring the BWC account, the rebate announcement was unforeseen, or that OMSNC maintained its BWC account and paid its premiums through the end of 1997. The rebate, however, paid in two checks totaling $88,248.40, was cashed by Olmsted Ltd.[1]
 {¶ 14} When OMSNC learned of the rebate and Olmsted Ltd. refused to return it, OMSNC filed a complaint alleging breach of contract, conversion, fraud, and unjust enrichment, and both parties moved for summary judgment. The judge granted partial summary judgment to OMSNC on its contract claim, finding that the parties executed the U-9 transfer form pursuant to the purchase agreement's covenant of further assurances, and solely for the purpose of allowing Olmsted Ltd. to benefit from OMSNC's favorable experience rating. He found that the rebates were not within the contemplation of the parties when they executed the U-9 form, and the form did not represent any agreement about rebates. He then found that, under Article 3.01 of the purchase agreement, OMSNC was entitled to the rebate because it was the result of OMSNC paying the 1997 insurance premiums.[2]
 {¶ 15} Olmsted Ltd.'s first appeal was dismissed for lack of a final appealable order[3] and, after remand, OMSNC voluntarily dismissed the remaining counts of its complaint. Olmsted Ltd.'s two assignments of error state:
 {¶ 16} "I. The trial court erred in denying defendant-appellants' motion for summary judgment because the right to the BWC rebate was determined by ownership of the risk account and controlled by the U-9 agreement as a valid and unambiguous business contract entered into subsequent to the asset purchase agreement, which agreement expressly transferred and waived all rights of plaintiff-appellees to the BWC risk account, and therefore, the right to the rebate."
 {¶ 17} "II. The trial court erred in granting summary judgment in favor of plaintiff/appellees."
 {¶ 18} We review the grant of summary judgment de novo, using the same standard as the trial judge.[4] The burden is on the moving party to show that there is no genuine dispute of fact and that it is entitled to judgment as a matter of law.[5] Moreover, the interpretation of unambiguous written contract terms is a matter of law that we review de novo.[6] Neither party claims ambiguity in any of the contract provisions or asserts a dispute of fact, but each instead claims entitlement to the rebate based upon the written terms of the documents.
 {¶ 19} Olmsted Ltd.'s basic claim is that the U-9 transfer form is a wholly separate, subsequent agreement between the parties that supersedes any contradictory terms in the purchase agreement. It argues that, under the parol evidence rule, evidence of a prior agreement cannot be used to contradict the terms of a later written agreement. In response, OMSNC argues that the U-9 form is not a contract, that it was intended solely to transfer its experience rating to Olmsted Ltd., that it does not indicate an intent to transfer OMSNC's rebate rights to Olmsted Ltd., and that the terms of the purchase agreement continue to control disposition of the rebate. We need not address each of these arguments directly because the parol evidence rule does not bar application of the terms of the purchase agreement.
 {¶ 20} "It is a well-known principle that contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language."[7] Where the parties have reached a final, written agreement with respect to at least some terms, evidence of prior agreements or negotiations cannot be used to contradict those terms.[8] Where the written agreement is not final as to all terms, however, parol evidence can be used to supply consistent additional terms.[9] Regardless of whether the agreement is completely or partially integrated, parol evidence can be used to establish the meaning of the written terms, but a judge must find an ambiguity in the written terms or circumstances that "invest the language of the contract with a special meaning" before allowing parol evidence in aid of interpretation.[10] Parol evidence is admissible, however, to make the preliminary determination of whether an agreement is integrated and, if so, whether the integration is complete or only partial.[11]
 {¶ 21} The U-9 transfer form cannot be assessed without also analyzing the purchase agreement, because it is apparent that the transfer would not have taken place absent the sale.[12] The judge made essentially the same finding, stating that the parties executed the BWC account transfer as part of OMSNC's duties under Articles 6.01(g) and 10.04. Although Olmsted Ltd. argues that the U-9 form represents a separate agreement independent from any of the provisions of the purchase contract, we agree that the transfer form was executed pursuant to the purchase agreement. The transfer form, by itself, does not suggest a bargain between these parties because it is not concerned with the terms of any agreement between the former employer and the succeeding employer, but is instead directed at governing the rights and liabilities of those parties with the BWC. The transfer affected OMSNC's right to seek its rebate from the BWC, but it did not affect its right to seek the rebate from Olmsted Ltd. because the transfer form was silent on the parties' agreement to transfer the ownership of OMSNC's BWC policy number.
 {¶ 22} Analyzed in light of the purchase agreement, the U-9 form cannot be considered a final or complete expression of the agreement between OMSNC and Olmsted Ltd. The form itself contemplates that another, separate transaction has created the former employer/succeeding employer relationship. Whatever effect the U-9 form might have had on the rights between the parties in the absence of another agreement, the form's boilerplate language, drafted by a government agency and not by either of the parties, cannot be used to subvert the terms of the agreement specifically negotiated between them.[13]
 {¶ 23} Even if one considers the U-9 form to be a final statement of some terms between OMSNC and Olmsted Ltd., the agreement is only partially integrated, and thus can be supplemented by evidence of consistent additional terms.[14] Where a single contract is at issue, it is interpreted so as to give effect to all its terms, and its terms are interpreted as consistent with one another unless contradiction is unavoidable.[15] Because the purchase agreement and the U-9 form are related documents within a single transaction, these principles should also apply here,[16] and the most reasonable construction of the two documents is that the U-9 form controls only the parties' relationships with the BWC, and does not contradict the terms of the purchase agreement. This interpretation gives effect to the terms of both documents without nullifying any terms of either. Furthermore, it interprets the written terms consistent with the parties' intentions.[17]
There is no dispute that the intent of the transfer was solely to allow Olmsted Ltd. to lower its workers' compensation insurance premium, and not to supersede any provisions of the purchase agreement concerning the apportionment of income and expenses. Our interpretation, as well as the judge's, is consistent with the parties' intentions and with the express terms of the documents.
 {¶ 24} This interpretation also negates Olmsted Ltd.'s final contention, that giving effect to the purchase agreement will upset the finality of the BWC's transfer and prevent the agency from operating efficiently. As noted, however, the form does conclusively fix the parties' rights and liabilities with respect to the BWC, and that is all that is necessary. If the parties have other agreements affecting their rights with each other, those agreements can be given effect without compromising the BWC's operations.
Judgment affirmed.
It is ordered that appellee shall recover of appellant costs herein taxed.
The court finds that there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA A. BLACKMON, P.J., AND COLLEEN CONWAY COONEY, J., CONCUR.
N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc. App.R.22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E), unless a motion for reconsideration with supporting brief, per App.R. 26(A) is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).
[1] At the time the first check was issued there was an outstanding balance on OMSNC 1997 risk account of about $5,000 which was deducted.
[2] The parties have not raised the issue of whether the rebate should be apportioned between them, and we consider the issue waived.
[3] Olmsted Manor Skilled Nursing Ctr., Inc. v. Olmsted Manor, Ltd.
(Nov. 20, 2001), Cuyahoga App. No. 79760.
[4] Civ.R. 56(C); Druso v. Bank One of Columbus (1997),124 Ohio App.3d 125, 130-131, 705 N.E.2d 717.
[5] Dresher v. Burt, 75 Ohio St.3d 280, 293-294, 1996-Ohio-107,662 N.E.2d 264.
[6] Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm, 73 Ohio St.3d 107,108, 1995-Ohio-214, 652 N.E.2d 684.
[7] Skivolocki v. East Ohio Gas Co. (1974), 38 Ohio St.2d 244, 247, 67 O.O.2d 321, 313 N.E.2d 374.
[8] Camargo Cadillac Co. v. Garfield Ent's., Inc. (1982),3 Ohio App.3d 435, 438-39, 3 OBR 514, 445 N.E.2d 1141.
[9] Id.
[10] Shifrin v. Forest City Ent's., Inc., 64 Ohio St.3d 635,1992-Ohio-28, 597 N.E.2d 499, syllabus.
[11] 2 Restatement of the Law 2d, Contracts (1981) 115, 132-133, Sections 209(2) and (3), 214(a) and (b); Hurban v. Haas (Dec. 29, 1999), Medina App. No. 2725-M.
[12] Edward A. Kemmler Mem. Found. v. E. Dublin-Granville Rd. Co.
(1992), 62 Ohio St.3d 494, 499-500, 584 N.E.2d 695; Center Ridge Ganley,Inc. v. Stinn (1987), 31 Ohio St.3d 310, 313-314, 31 OBR 587,511 N.E.2d 106.
[13] 2 Restatement of the Law 2d, Contracts (1981) 92-93, Section 203(d); Famous Supply Co. of Warren v. A.B. Cole, Inc., Trumbull App. No. 2000-T-0069, 2001-Ohio-8882.
[14] 2 Restatement of the Law 2d, Contracts (1981) 129, 137, Sections 213(1), 216; Camargo Cadillac Co., supra, 3 Ohio App.3d at 438-439.
[15] 2 Restatement of the Law 2d, Contracts (1981) 92-93, Section 203(a); Ottery v. Bland (1987), 42 Ohio App.3d 85, 87, 536 N.E.2d 651.
[16] This is so whether one views the documents as two parts of a single agreement or as separate contracts executed under circumstances investing the language with "special meaning" under Shifrin, supra.
[17] SM Constructors, Inc. v. Columbus (1982), 70 Ohio St.2d 69, 71, 24 O.O.3d 145, 434 N.E.2d 1349.